FILED

## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

04 JUN 24  PH 3:06

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARGIE REAVES FOWLER, et al,          )
                                      )
    Plaintiffs,                       )
                                      )
                                      )
v.                                    )      Civil Action No.: CV-04-PT-712-M
                                      )
PHARMACIA and UPJOHN COMPANY,         )
MCKESSON CORPORATION,                 )
CHARLIE WATSON, et al,                )

ENTERED

JUN 24 2004

### MEMORANDUM OPINION

    This cause comes on to be heard upon defendant Charlie Watson's ("Watson") motion to

dismiss, filed on April 7, 2004, and plaintiffs Margie Reaves Fowler's ("Mrs. Fowler") and Mark

Fowler's ("Mr. Fowler") motion to remand, filed on May 7, 2004.

### FACTS[1] AND PROCEDURAL HISTORY

    Plaintiff Margie Reaves Fowler ("Fowler") is an adult resident of St. Clair County, Alabama.

Plaintiff Mark Fowler is her husband. Defendants Pharmacia & Upjohn Company ("P&U Co.") and

McKesson Corporation ("McKesson") are corporations doing business in Alabama. Defendant

Watson, an employee of McKesson,[2] allegedly "sold and/or distributed" the drug at issue.

---

    [1] The "facts" are as alleged in the complaint.

    [2] The complaint, this court notes, does not allege McKesson Corporation's specific role
regarding Depo Provera (also known as medroxyprogesterone). However, defendant Watson's
affidavit attached to the notice of removal stated: "My employer, McKesson Medical-Surgical,
did not manufacture Depo-Provera Contraceptive Injection. McKesson Medical Surgical was
only a distributor of Depo-Provera . . . ."

1



EXHIBIT
E

Mrs. Fowler was prescribed and received injections of Depo Provera[3] from June 1999 through December 2001. The injections were given by a licensed health care provider in a clinical setting. Depo Provera was allegedly "manufactured, created, designed, tested, labeled, sterilized, packaged, supplied, marketed, sold, advertised, prescribed, administered and otherwise distributed by the Defendants herein." *See* Compl. ¶ 7. On February 28, 2002, Mrs. Fowler suffered a stroke, which according to plaintiffs, was proximately caused by Depo Provera. *Id.* at ¶ 9.

On February 27, 2004, plaintiffs filed a complaint in the Circuit Court of St. Clair County, Alabama. The complaint contained the following counts against all defendants: Count One (AEMLD); Count Two (Negligence);[4] Count III (Breach of Express Warranty); Count IV (Breach

---

[3] Depo Provera is a medication commonly prescribed to women as a contraceptive alternative to "the pill." Depo Provera, taken as an injection, contains a synthetic hormone similar to the natural hormone progesterone and is offered to protect women from pregnancy for three months per injection. *See* Compl. ¶ 6.

[4] Count Two claims that defendants failed to exercise due care by committing the following acts and omissions:

    a.    Failed to adequately and properly test and inspect Depo Provera so as to ascertain whether or not it was safe and proper for the purpose for which it was designed, manufactured or sold.

    b.    Failed to utilize and/or implement a reasonably safe design in the manufacture of Depo Provera.

    c.    Failed to manufacture Depo Provera in a reasonably safe condition for which it was intended;

    d.    Failed to adequately and properly warn the Plaintiff purchasing Depo Provera of the risks of complications when used in a manner for which it was intended;

    e.    Failed to adequately and properly warn the Plaintiff purchasing Depo Provera of the risks of diseases when used in a manner for which it was intended;

    f.    Failed to adequately and properly labeled (*sic*) Depo Provera so as to warn the Plaintiff of the risks of complications;

    g.    Failed to adequately and properly label Depo Provera so as to warn the Plaintiff of the risks of complications;

of Implied Warranty); Count V (Damages); Count VI (Unjust Enrichment)[5]; and Count VII (Loss of Consortium by Mr. Fowler). On April 7, 2004, defendants filed a notice of removal, alleging the existence of complete diversity of citizenship between the parties and fraudulent joinder of the non-diverse defendant, Watson. On April 7, 2004, defendant Watson filed the motion to dismiss at issue here.[6] Plaintiffs responded with a motion to remand. The court considers both motions here.

### RULE 12(b)(6) STANDARD

Rule 12(b)(6) tests the legal sufficiency of a complaint. When considering a Rule 12(b)(6) motion, the court assumes that all factual allegations pled in the complaint are true. *United States*

---

h.    Manufactured which (*sic*) constituted a hazard to health;
i.    Manufactured Depo Provera which caused adverse side effects; and
j.    Were otherwise careless and negligent.

*See* Compl. ¶ 20.

[5] Specifically, Count VI alleges that defendants have profited and benefitted from plaintiff's use of Depo Provera. Additionally, Count VI alleges:

> Defendants . . . have voluntarily accepted and retained these profits and benefits, derived from the Plaintiff, with full knowledge and awareness that, as a result of Defendants'. . . fraud and other conscious and intentional wrongdoing, Plaintiff did not receive a product of the quality, nature or fitness that had been represented by Defendants . . . or that Plaintiff, as a reasonable consumer, expected.

> By virtue of the conscious wrongdoing alleged in this Complaint, Defendants ... have been unjustly enriched at the expense of the Plaintiffs, who are entitled to in equity, and hereby seek the disgorgement and restitution of Defendants . . . wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court . . . .

*Id.* ¶¶ 35-36.

[6] The court notes that Watson is the only defendant filing the motion to dismiss at issue here. Defendant P&U Co. submitted the response in opposition to plaintiffs' motion to remand. *See infra.*

3

*v. Gaubert*, 499 U.S. 315, 327, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). All factual allegations are to be construed in the light most favorable to the plaintiff. *Brower v. County of Inyo*, 489 U.S. 593, 598, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989). Dismissal under Rule 12(b)(6) is appropriate "'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations' of the complaint." *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1282 (11th Cir. 2002) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

## MOTION TO REMAND STANDARD

Federal courts are courts of limited jurisdiction. *See Russell Corp. v. American Home Assurance Co.*, 264 F.3d 1040, 1050 (11th Cir. 2001). Therefore, federal courts have power to hear only those cases that they have been authorized to hear by the Constitution or by Congress. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). The limited nature of federal court jurisdiction has caused the Eleventh Circuit to favor remand of removed cases where federal jurisdiction is not absolutely clear. *Russell Corp.*, 264 F.3d at 1050. The removal statute is to be construed narrowly with doubt construed against removal. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107-09 (1941).

A case may be removed to federal court only if the case could have been brought originally in federal court pursuant to the court's diversity or federal question jurisdiction. *See* 28 U.S.C. § 1441(a). However, diversity will not support removal jurisdiction if any properly joined defendants are citizens of the state in which the suit was originally filed. *See* 28 U.S.C. § 1441(b). The determination of whether federal jurisdiction exists must be made on the face of the plaintiff's well-pleaded complaint. *Pacheco De Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir. 1998). An anticipated or even inevitable federal defense generally will not support removal. *Id.* at 1373 (citing

4

*Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392-93 (1987)). The burden of establishing federal jurisdiction is placed on the defendant, with all doubts resolved in favor of remand, *Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996). When multiple defendants are involved, all defendants must consent to removal. *Russell Corp.*, 264 F.3d at 1050.

## ARGUMENTS

## MOTION TO DISMISS

I.    <u>Defendant Watson's Motion</u>

Watson submits that no cause has been stated against him under Alabama law. Relying on *In re Rezulin Products Liability Litigation*, 133 F. Supp. 2d 272, 287-88 (S.D.N.Y. 2001)(predicting Alabama law), Watson argues, a plaintiff patient cannot state a cause of action against a sales representative (or account manager like defendant) of a distributor of a prescription drug. Watson further relies on the Alabama Supreme Court's decision in *Walls v. Alpharma USPD, Inc.*, 2004 WL 406759 (Ala. March 5, 2004).

In support of dismissal, Watson relies on his own affidavit, which avers that he was not a manufacturer of Depo-Provera and that he was never involved in the manufacture, development, or testing of the drug. Watson alleges that he has not had dealings with either of the plaintiffs.

Watson's affidavit further provides: Watson has "not made any statements to the general public or participated in any advertising or promotion to the general public concerning Depo Provera . . .". ; Watson was not a physician or pharmacist and thus never prescribed or filled a prescription for Depo Provera; As an employee of a distributor, Watson's role was taking orders from physicians' offices; "If their order included a request for Depo-Provera . . .this product, with the information as packaged by the manufacturer, was shipped with the order to their [the physicians'] offices"; and

5

Watson was not a "seller" of Depo Provera.

### A.    Counts One and Two – AEMLD and Negligence

A threshold element of recovery for an AEMLD claim, Watson contends, is showing that defendants "manufactured and/or sold the allegedly defective product." *See Turner v. Azalea Box*, 508 So. 2d 535, 254 (Ala. 1987); *Atkins v. Am. Motors Corp.*, 335 So. 2d 134 (Ala. 1976). Courts from other jurisdictions interpreting Alabama product liability tort theories, Watson claims, have held that no cause of action is stated against sales representatives since they are not "sellers." *See In Re Rezulin, supra*, at 287-88 (S.D.N.Y. 2001). *See also Andrews, et al, v. Bayer Corp, et al; In re Baycol Products Litigation*, MDL No. 1431, slip op. 4 (D. Minn. March 26, 2004)(attached as Exhibit B).

These courts considered the purpose of the AEMLD in analyzing the potential liability of sales representatives of drug manufacturers. *In Re Rezulin* stated: "The AEMLD is founded on 'broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of these products.'" 133 F. Supp. 2d at 287 (quoting *Atkins* at 139). Furthermore, the *Rezulin* court found: "The sales representative joined in the Alabama case neither manufactured, sold nor supplied Rezulin (the prescription drug at issue in the case). Rather, he was an 'agent of the manufacturer and seller.'" *Id.* at 287-288. Here, Watson repeats, he was neither the manufacturer nor seller of Rezulin. Furthermore, Watson asserts, he is even further removed from liability than the sales representative in *Rezulin* since he was only the distributor's agent.[7]

---

[7] Watson again quotes *Rezulin*: " As a corporate employee, he [the representative] was 'not the one best able' to prevent the sale of defective drugs. In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for

Regarding the negligence claims, Watson asserts, they should be dismissed for the same reason, i.e., he was neither the "manufacturer" nor "seller" of Depo Provera. *See Norton Co. v. Harrelson*, 176 So. 2d 18, 20 (Ala. 1965).[8] Additionally, Watson argues, since the negligence count contains the language of the AEMLD, i.e., "It could have been reasonably anticipated by the Defendants . . . that said product would become inherently or imminently dangerous to human life or health when put to its intended, ordinary and customary use," it is redundant with the AEMLD count. Alabama courts have found that when two counts are redundant, the negligence claim is not considered to constitute a separate cause of action. *See Veal v. Teleflex, Inc.*, 586 So. 2d 188, 191 (Ala. 1991).[9]

Watson relies on the *Walls* decision as supporting his position. *See* Exhibit C. In *Walls*, the plaintiff sued her pharmacist for failure to warn of foreseeable injuries from the use of the prescription drug he dispensed to her. The Northern District of Alabama certified the following question to the Alabama Supreme Court: "Does a pharmacist have a duty to warn of foreseeable

---

supposing that it would impose liability on the sales representatives in this case."

[8] The *Norton* court stated:

> This doctrine [of manufacturer's liability] is applicable in a limited number of situations. The defendant must be either the manufacturer or seller of the injury-producing article. There is no privity of contract between the defendant and the injured plaintiff. At the time complained of the article must have been applied to the use for which it was manufactured and sold and that use must be in the usual and customary manner. Where these circumstances exist the manufacturer or seller will be liable for an injury proximately resulting from the use of the article but only where the article is inherently or imminently dangerous to human life or health, or becomes so when put to its intended use in the proper manner. This liability arises from either the negligent manufacture of the article or negligence in selling it.

[9] This court notes that *Veal* does so suggest.

7

injuries from the use of a prescription drug he/she is dispensing under AEMLD, common-law negligence or other Alabama law?"

In *Walls*, the pharmacist had direct contact with the plaintiff and had directly sold the prescription drug to the plaintiff. Even in that situation, Watson contends, the court applied the learned intermediary doctrine and held that the pharmacist had no duty to warn a customer or any other ultimate customer of the risk or potential side effects of the prescription drug. The Supreme Court observed that

> where prescription drugs are concerned the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. This special standard for prescription drugs is an understandable exception to the Restatement's general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products. *See* Restatement (Second) of Torts, Section 388 (1965).

*Walls* at *3 (citing *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 at 1276)(citations omitted). The *Walls* court further noted language from other cases that to impose a duty to warn on a pharmacist would "intrude on the doctor-patient relationship and would force the pharmacist to practice medicine without a license." *Id.* at *4.[10]

Defendant concludes: "The rationale which the Alabama Supreme Court followed in holding that prescription drugs are an exception to the Restatement's general rule certainly is even more applicable in the case at bar. If the manufacturer's duty to warn flows only to the physician and if other parties would be liable for interfering in the physician-patient relationship should advice be given to the patient, then it is abundantly clear that Charles Watson cannot be subject to potential liability under Alabama law."

---

[10] This court does not find *Walls* to be significantly apt here.

### B.    Counts Three and Four - Breach of Express and Implied Warranties[11]

According to Watson, a breach of warranty claim (whether express or implied) arises

exclusively against a product's "seller." *See* Ala. Code §§ 7-2-313(1), 7-2-314(1), and 7-2-315. The

Alabama courts, Watson argues, have affirmed this principle.  *See, e.g., Rutledge v. Arrow*

*Aluminum Indust.*, 733 So. 2d 412, 417 (Ala. Civ. App. 1998).  The *Rutledge* court found:

> With regard to Rutledge's AEMLD and breach of implied warranty of fitness
> claims against Foshee Builders, it is undisputed that Foshee Builders bought
> the sliding glass door and that a subcontractor installed the door. Rutledge failed
> to present any evidence that Foshee Builders is in the business of selling sliding
> glass doors. Therefore, we conclude that Foshee is not a seller within the meaning
> of the AEMLD or § 7-2-103 and that the trial court properly entered a summary
> judgment in favor of Foshee Builders on Rutledge's AEMLD and breach of implied
> warranty of fitness claims.

---

[11] To the extent the warranty claims are redundant with AEMLD claims and based on the
allegation that the drug was unreasonably dangerous, defendant argues, these claims are due to
be dismissed due to the distinction between tort and UCC causes of action. According to
defendant, whether Depo-Provera is unreasonably dangerous is not properly addressed in a
warranty claim, only in an AEMLD claim.  *See Yarbrough v. Sears, Roebuck & Co.*, 628 So. 2d
478 (Ala. 1993), which found:

> The Yarbroughs' claim of a breach of the implied warranty of merchantability is
> to the effect that the kerosene heater was unreasonably dangerous and therefore could not
> be merchantable. "Such an argument ignores the clear distinction between causes of
> action arising under tort law and those arising under the U.C.C. as adopted in Alabama."
> Shell v. Union Oil Co., 489 So.2d 569, 571 (Ala.1986). Whether the kerosene heater was
> unreasonably dangerous is not a question properly addressed in a claim alleging breach
> of warranty under the U.C.C., but it could be, and was, properly raised in a claim under
> the AEMLD.

*Compare Spain v. Brown & Williamson Tobacco Corp.*, 2003 WL 21489727 (Ala.
2003)(distinguishing *Yarbrough*).  In addressing the certified question from the Eleventh Circuit
about the implied warranty of merchantability, the court distinguished *Yarbrough* based on the
failure to allege that the product was not fit for the ordinary purpose. The *Spain* court then held:
"[A] claim alleging breach of an implied warranty of merchantability is separate and distinct
from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous
product."

9

Watson reiterates that his position is an account manager of McKesson, a corporation which distributes pharmaceutical products ordered by physicians. As such, Watson asserts, he is not a "seller" for purposes of the U.C.C..

Moreover, Watson argues, an additional reason to dismiss the warranty claim is that Watson had no contact with plaintiffs. Under Alabama law, Watson contends, express warranties arise from affirmative statements of fact. *See* Ala. Code § 7-2-313 (1975). Similarly, Watson argues, an implied warranty cannot arise unless the plaintiff relies on the seller's skill or judgment during the purchase. *See Ex Parte General Motors Corp.*, 769 So. 2d 903, 911 (1999). Since Watson had no contact with plaintiffs, he could not have made affirmative statements or express warranties to them. Additionally, plaintiffs could not have relied on his skill or judgment during their purchase. As a final reason to dismiss plaintiffs' implied warranty claim, Watson asserts, he is not a "merchant with respect to goods of that kind" as required by § 7-2-314. *See Loeb & Co. v. Schreiner*, 321 So. 2d 199 (Ala. 1975); *Huprich v. Bitto*, 667 So. 2d 685 (Ala. 1995).

## C.    Count Five - Unjust Enrichment

Defendant Watson quotes the Alabama Supreme Court in *Mitchell v . H&R Block, Inc.*, 783 So.2d 812, 817 (Ala. 2000): "[T]he essence of the theories of unjust enrichment ... is that a Plaintiff can prove facts showing that Defendant holds money, which in equity and good conscience, belongs to the Plaintiff or holds money which was improperly paid to Defendant because of mistake or fraud." *See also Ammons v. Coffee County*, 716 So. 2d 1227 (Ala. Civ. App. 1998).

First, Watson argues, since plaintiffs have not stated a valid, independent claim against him, they cannot prevail on their unjust enrichment claim. Second, Watson contends, plaintiffs have not alleged in the complaint that Watson benefitted personally from the sale of Depo-Provera or

10

collected money from plaintiffs in exchange for this product. Watson repeats his contention that he is not a "seller" of the product.

## II.     Plaintiffs' Response[12]

### A.     Standard of Review

This court must first determine if it has jurisdiction over the complaint. *See Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1557 (11th Cir. 1989); *Univ. of South Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Strict construction of the removal statutes, plaintiffs argue, is required. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941); *Clay v. Brown & Williamson Tobacco Corp.*, 77 F. Supp. 2d 1220 (M.D. Ala. 1999).

Further, plaintiffs argue, this court must construe all disputed questions of fact and controlling substantive law in favor of plaintiffs on removal. *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440-41 (11th Cir. 1983)("In determining whether joinder of a resident party has been fraudulent, a district court evaluates the factual allegations in the light most favorable to the plaintiff.").

The removing party, plaintiffs assert, bears a heavy burden in establishing fraudulent joinder. The test for determining whether joinder of a defendant has been fraudulent is as follows:

> (1) [L]ook to see whether there is no possibility that plaintiff can establish any cause of action against the resident defendant; and

---

[12] Plaintiffs note their contemporaneous filing of a motion to remand for lack of jurisdiction. According to plaintiffs, the arguments in support of remand are identical to their response to dismissal. The motion to dismiss and motion to remand, plaintiffs contend, are "really just both sides of the same coin." By plaintiffs' account, if this court grants the motion to remand, the case will be due to be remanded without this court's consideration of the motion to dismiss. On the other hand, plaintiffs contend, if the court denies remand, the court must necessarily have determined plaintiffs had no possibility of establishing any cause of action against the resident defendant, thus requiring the granting of defendant's motion to dismiss.

11

(2) [L]ook to see whether plaintiff has fraudulently pled jurisdictional facts in order to bring the resident defendant into state court.

*See Cabalceta* at 1561. (Emphasis added). "When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Fowler v. Provident Life & Accident Ins. Co.*, 256 F. Supp. 2d 1243, 1247 (N.D. Ala. 2003)(citation omitted). Further, *Fowler* provided: "The plaintiff need not have a winning case against the allegedly fraudulent defendant; she need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate." *Id.* (citation omitted).

**B.    Argument**

1.    Plaintiffs Have Sufficient Evidence to Support an AEMLD Claim and a Common Law Negligence Claim Against Defendant, Charlie Watson.

Plaintiffs tout *Clay v. Brown & Williamson Tobacco Corp.*, 77 F. Supp. 2d 1220 (M. D. Ala. 1999) as analogous. In *Clay*, plaintiffs argue, the court held that plaintiff had an arguable claim against an account manager for defendant pursuant to the AEMLD because the account manager "had superior knowledge to that of the average consumer." *Id.* at 1224. Additionally, the *Clay* court found, additional discovery provided an arguable showing that the account manager "actively participated in the sale and distribution of Brown & Williamson tobacco products," which further bolstered plaintiff's AEMLD claim. In part, the *Clay* court relied on the following rationale from *Seaborn v. R.J. Reynolds Tobacco Co.*, No. 96-T-1540-N (M.D. Ala. 1996):[13]

> [Plaintiff] seeks to hold not only R.J. Reynolds liable under the AEMLD, he seeks to hold some of the company's individual employees--Tate, Huffman, McDermott, Hightower, and Hinson--liable as well. "In Alabama, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective

---

[13] No copy of *Seaborn* has apparently been provided to this court.

12

> of whether they were acting in a corporate capacity." *Ex parte Charles Bell Pontiac-Buick- Cadillac-GMC, Inc.,* 496 So.2d 774, 775 (Ala.1986) (citing *Candy H. v. Redemption Ranch, Inc.,* 563 F.Supp. 505, 513 (M.D.Ala. 1983)); see also *Chandler v. Hunter,* 340 So.2d 818, 822 (Ala.Civ.App. 1976). Obviously, to the extent R.J. Reynolds allegedly violated the AEMLD, it acted through its employees; the company does not employ ghosts. [Plaintiff] should be allowed to pursue these individual defendants, and, if, after discovery, it should turn out that he has named the wrong persons, he should be allowed to make substitutions.

In this case and its companion case, *Jenkins v. R.J. Reynolds Tobacco Co. No. 96-T-1489-N* (M.D. Ala. 1996), plaintiffs note, the court found no evidence of fraudulent joinder. Additionally, plaintiffs rely on the *Clay* court's statement: "Rule 11 recognizes that a Plaintiff may need additional discovery to establish an evidentiary basis for an allegation." *Id.* at 1224 (citing *Sellers v. Foremost Ins. Co.,* 924 F. Supp. 1116 (M.D. Ala. 1996)). The court found that plaintiff had met her burden pursuant to Rule 11 and believed that additional discovery could show that the account manager participated in the tort against the plaintiff due to his position with defendant tobacco company.

Here, plaintiffs assert, Watson is an account manager at McKesson, and Birmingham is part of his sales territory. In this capacity, plaintiffs argue, Watson sold, distributed and supplied medical and surgical equipment, i.e., Depo-Provera, to Mrs. Fowler. *See* Watson Decl..

Plaintiffs rely on "The Job Description of an Account Manager at McKesson Medical-Surgical" posted on McKesson's website, Pl. Ex. B. The job description, plaintiffs argue, lists the following responsibilities for McKesson Account Manager[14]:

- Selling products or services;
- Performing field promotion work and developing new accounts;
- Demonstrating products and/or services and providing assistance in the

---

[14] The McKesson website, plaintiffs note, lists openings for account managers in cities including LaCrosse and Madison, Wisconsin; Jacksonville, Florida; Portland, Oregon; etc. Plaintiffs contend that all the job descriptions for the locations listed are identical.

13

> best application of products or services;
> - Answering all questions concerning products or services and referring questions as necessary;
> - Investigating product/service warranty claims to ensure resolution within marketing policies;
> - Contacting prospects and explaining features and merits of products or services offered, utilizing persuasive sales techniques.

*See* Pl. Ex. B.

According to plaintiffs, Watson has superior knowledge of Depo-Provera compared to the average consumer, since his job duties include demonstrating the products/services, providing assistance in the best application of the products/services, and explaining the features and merits of the products/services offered. Moreover, plaintiffs argue, in this case they have stronger support for their claims against Watson than the *Clay* plaintiff since they already have proof of Watson's superior knowledge to that of the average consumer regarding Depo-Provera (as evidenced by the foregoing job description).

The AEMLD claim against Watson, plaintiffs contend, is "particularly strong considering that part of Mr. Watson's job description provides for him to 'demonstrate products and/or services and provide assistance in the best application of product or services.'" Plaintiffs further argue:

> In this case, the product Depo-Provera, was used for a purpose or application other than the purpose or application for which it had been approved by the Food and Drug Administration (hereinafter FDA). Therefore, through Mr. Watson's assistance with the best application of Depo-Provera, the plaintiff, Margie Fowler was given Depo-Provera for a purpose other than the purpose for which it had been approved by the FDA.[15]

In the complaint, plaintiffs assert, they clearly alleged that Watson was engaged in the business of marketing, selling, advertising, supplying, and distributing Depo-Provera, that the

---

[15] This allegation, the court notes, does not appear to be contained in the complaint.

14

product was defective and unreasonably dangerous, and that as a result Fowler was injured. Plaintiffs repeat the general content of their AEMLD and negligence claims.[16]

Lastly, plaintiffs argue, a corporation's employees are liable for torts in which they personally participated, even if they were acting in a corporate capacity. *See Ex Part Charles Bell Pontiac-Buick-Cadillac-GMC, Inc.*, 496 So. 2d 774, 775 (Ala. 1986). According to plaintiffs, McKesson could not violate the AEMLD on its own; rather, it had to act through its employees. Moreover, plaintiffs add, Watson committed negligence beyond the bounds of the AEMLD.

### 2.    The Defendant's Argument for Removal Lacks Legal Support.

Plaintiffs attempt to distinguish *In re Baycol* and *In re Rezulin*. According to plaintiffs, these cases represent the opinions of the Minnesota and New York federal district courts, respectively, interpreting Alabama law and thus should not be treated as controlling or given weight in this case. Further, plaintiffs contend, *In re Baycol* involved affidavits from the non-diverse defendants that they were not sellers, manufacturers, developers, or testers of the drug Baycol, and the reported opinion indicates that the *In re Baycol* plaintiffs had no evidentiary support to contradict these affidavits. On the other hand, plaintiffs argue, they possess evidence to contradict Watson's affidavit. Although in *In re Rezulin*, plaintiffs assert, the sales representatives were held to be fraudulently joined, here Watson is not a sales representative but rather an account manager with superior knowledge. Again, plaintiffs rely on *Clay, supra.*

Moreover, plaintiffs contend, defendant mistakenly relies on *Walls v. Alpharma USPD, Inc.*. According to plaintiffs, *Walls* held that a pharmacist does not have a duty to warn a customer or ultimate customer of risks or side effects pursuant to the learned-intermediary doctrine. However,

---

[16] The court has summarized the complaint *supra.*

15

plaintiffs argue, *Walls* neither limits an account manager's duty to warn nor forecloses AEMLD/common law negligence claims against an account manager with superior knowledge and active involvement in the sale/distribution of a product. Furthermore, plaintiffs contend, the pharmacist in *Walls* did not work directly for the manufacturer, distributor, supplier, advertiser, or seller of the drug made the basis of the lawsuit, unlike Watson, who works directly for McKesson (which allegedly distributed, supplied, advertised and sold Depo-Provera.)

### III.     Defendant Watson's Reply

First, Watson argues, plaintiffs' reliance on *Clay v. Brown & Williamson Tobacco Corp.* is misplaced. While *Clay* involved cigarettes and a defendant who worked for the actual manufacturer, the Fowler case involves a prescription medication and a defendant who worked for a distributor. Further, Watson reminds the court, the Alabama Supreme Court recently applied the learned-intermediary doctrine to pharmacists in *Walls, see supra.* According to Watson, *Walls* expanded and reinforced the exception to AEMLD liability in cases arising from the use of prescription medications where the underlying duty to warn runs from the manufacturer to the patient's doctor.[17] *Walls,* Watson argues, clarified that the learned intermediary doctrine forecloses the existence of a duty to

---

[17] In *Stone v. Smith, Kline & French Laboratories,* 731 F.2d at 1575 (11th Cir. 1984), Watson notes, the Eleventh Circuit certified to the Alabama Supreme Court the question of whether an adequate warning to the prescribing physician but not to the ultimate consumer was sufficient as a matter of law. The Alabama Supreme Court in *Stone v. Smith, Kline & French Laboratories,* 447 So. 2d 1301 (Ala. 1984) adopted the Fifth Circuit's learned-intermediary doctrine , which held that pharmaceutical companies who were selling prescription drugs only had a duty to warn the prescribing doctor. According to Watson, the *Walls* court cited with approval language from the *Stone* opinion that imposing a duty to warn on a pharmacist would intrude on the doctor/patient relationship and force the pharmacist to practice medicine without a license, and such reasoning should apply with equal force to Watson. Furthermore, Watson notes, *Walls* also cited language from other courts to the effect that it would be illogical to impose a greater duty on the pharmacist than on the manufacturer. By defendants' account, this same argument should apply to the account manager of a distributor.

warn, and thereby any AEMLD and negligence claim, against someone other than the manufacturer.

As in the instant case, *Walls* involved injuries resulting from a prescription drug. According to Watson, the fact that the product could only be obtained by prescription from a licensed physician led the Supreme Court to apply the learned-intermediary doctrine. Watson again quotes *Walls* and criticizes plaintiffs' position that *Walls* is inapplicable.[18]

In the instant case, Watson argues, the complaint alleges that Depo-Provera was commonly prescribed and that plaintiff was given injections by a licensed health care provider in a clinical setting. Plaintiffs' representation to the court that Watson sold Depo-Provera "to the plaintiff in this case," Watson contends, is false, since his affidavit confirms that he never had contact or dealings with the Fowlers, that he is not a physician or pharmacist, and that he never prescribed or filled a prescription for Depo-Provera. As an employee of the distributor, Watson alleged, his role was limited to taking orders from physicians' offices then shipping any orders for Depo-Provera. According to Watson, he was not involved in the doctor's decision to administer or prescribe Depo-Provera to Mrs. Fowler or in the sale of the product to the plaintiffs. Moreover, Watson points out, Watson has confirmed that he has "not made any statements to the general public or participated in any advertising or promotion to the general public concerning Depo-Provera."

Watson again asserts that the *Walls* rationale regarding prescription drugs as an exception to the Restatement's general rule "is even more applicable in the case at bar" and reasons as follows: "If the manufacturer's duty to warn flows only to the learned-intermediary physician and if other parties, without the medical education or knowledge of the medical history of the patient, would be liable for interfering in the physician-patient relationship should advice be given to the patient, then

---

[18] As indicated, this court feels that defendant over-emphasizes the significance of *Walls*.

it is abundantly clear that ...Watson, as an account manager of a *distributor*, owed no duty to the Plaintiffs and cannot be subject to potential liability under Alabama law."

This court, Watson argues, should not hold that he owed a duty to consumers he had never met and had no way to meet simply because his employer's website states that he is to demonstrate products and provide assistance. Any such holding, Watson contends, would be contrary to the AEMLD's purpose stated in *Atkins v. American Motors Corporation*, 335 So. 2d 134, 139 (Alabama 1976): "[The AEMLD is founded on] broader moral notions of consumer protection and on economic and social grounds, placing the burden to compensate for loss incurred by defective products on the one best able to prevent the distribution of these products." As neither the manufacturer nor seller of Depo-Provera, Watson argues, he is not the "one best able to prevent the distribution of the product." *See In Re Rezulin* at 287-88 (S.D.N.Y. 2001).[19]

Despite plaintiffs' argument to the contrary, Watson asserts, *In re Rezulin* and *In re Baycol*, *see supra*, should be given weight, as both federal courts were applying Alabama law. Watson reminds this court of the *Erie* rule, i.e., federal courts exercising diversity jurisdiction must apply the law of the state as interpreted by the state's highest court, and in the absence of state court precedent, the federal court must ascertain and apply state law as the court would if faced with a similar case. Unlike *Clay* (plaintiffs' supporting case), Watson argues, *In re Rezulin* and *In re Baycol* directly address AEMLD and negligence claims against sales representatives in cases involving prescription drugs. Notably, Watson asserts, plaintiffs have offered nothing to contradict the holdings of these cases except Watson's position as an account manager rather than a sales

---

[19] A threshold element of recovery under AEMLD, Watson repeats, is that plaintiff must prove that the defendant "manufactured and/or sold the allegedly defective product." *See Turner v. Azalea Box Co.*, 508 So. 2d 253, 254 (Ala. 1987).

representative. While plaintiffs suggest that Watson's title as an account manager somehow elevates him in the distribution chain, Watson argues, it is clear that he merely takes orders from physicians' offices.

In interpreting Alabama law, Watson contends, *In re Rezulin* and *In re Baycol* held that no cause of action was stated against sales representatives sued with respect to prescription drugs. *Rezulin* found the sales representative in that case had not manufactured, sold, or supplied the drug but was rather "an agent of the manufacturer and seller." Citing *Atkins*, the *Rezulin* court explained: "As a corporate employee, he [the sales representative] was 'not the one best able' to prevent the sale of defective drugs. In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for supposing that it would impose liability on the sales representatives in this case."

Since he did not manufacture or sell Depo-Provera, Watson argues, plaintiffs can state no possible negligence claim against him. Watson reiterates his position that the negligence claim embodied in Count II is redundant. Furthermore, Watson concludes, *Walls* confirmed that a negligence count cannot lie against Watson. In answering the certified questions, Watson argues, the Alabama Supreme Court held that, pursuant to the learned-intermediary doctrine, only the prescribing physician had a duty under a common law negligence theory.[20]

_____

[20] This court quotes the specific holding in *Walls*:

> On the basis of the foregoing authority and persuasive authority, we hold as follows. The learned-intermediary doctrine forecloses any duty upon a pharmacist filling a physician's prescription, valid and regular on its face, to warn the physician's patient, the pharmacist's customer, or any other ultimate consumer of the risks or potential side effects of the prescribed medication except insofar as the prescription orders, or an applicable statute or regulation expressly requires, that an instruction or warning be included on the label of the dispensed

19

Since plaintiffs' opposition only addressed Counts I and II (AEMLD and negligence) and made no attempt to oppose dismissal of Counts III, IV, or V (breaches of warranty and damages), Watson argues, Counts III, IV, and V are due to be dismissed for the reasons set forth above.[21]

## MOTION TO REMAND

I.    **Plaintiffs' Motion**

Plaintiffs' arguments in favor of remand appear to be identical to those set forth in their response to the motion to dismiss. *See supra.*

II.    **Defendant P&U Co.'s Response[22]**

A.    **Summary of Argument**

Since plaintiffs' motion to remand only addresses AEMLD and negligence, P&U Co. argues,

---

medication or be otherwise delivered. To the extent that the learned-intermediary doctrine applies, foreseeability of injury is eliminated as a basis for liability upon the pharmacist. To the extent that the learned-intermediary doctrine applies, the duty to determine whether the medication as prescribed is dangerously defective is owed by the prescribing physician and not by the pharmacist filling the prescription. Any question of what persons are due the duty owed by the prescribing physician is not before us. Accordingly, both questions certified to us are answered in the negative.

[21] Incidentally, this court notes, plaintiffs also have not addressed Count VI (unjust enrichment) and Count VII (loss of consortium). Defendant Watson addressed Count VI, *supra*, but not Count VII.

[22] Defendant P&U Co. filed the opposition to plaintiffs' motion to remand. P&U Co. refers generally to arguments in its Notice of Removal. The court has considered fully but does not set forth here the contents of the Notice of Removal.

Additionally, this court notes, P&U Co. has filed a supplemental opposition to remand on June 4, 2004. In its supplemental submission, P&U Co. contends that the right to remove is determined by the plaintiffs' pleading at the time of the petition for removal. *See Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989). As such, P&U Co. argues, this court cannot rely on the Fowlers' post-removal amendment to their complaint in determining subject matter jurisdiction.

20

only those claims have been addressed here. P&U Co. argues that Watson was fraudulently joined. The complaint, P&U Co. points out, contains a single specific reference to Watson in paragraph four, wherein it alleges that he "sold or distributed" Depo Provera on behalf of McKesson. Therefore, P&U Co. contends, there is not even an allegation that Watson sold or distributed the Depo Provera received by plaintiffs.

Watson worked for McKesson Medical-Surgical, P&U Co. alleges, which did not manufacture the product but merely distributed it. According to P&U Co., Watson had no dealings with patients or knowledge/information about patients' medical histories, symptoms, prognoses, or courses of treatment. Significantly, P&U Co. argues, Watson had no interaction with the Fowlers.

P&U Co. criticizes plaintiffs' reliance on tobacco-related cases. Under the law, P&U Co. contends, tobacco is not treated in the same manner as prescription medications, and that distinction proves fatal to plaintiffs' argument.

Under Alabama law, P&U Co. argues, prescription medications are treated as "unavoidably unsafe products" as described in Comment k to Section 402 of the Restatement of Torts (Second). According to P&U Co., prescription medications are "neither defective nor unreasonably dangerous if such a product is properly prepared and is accompanied by proper directions and warnings." *See Stone* at 1302. P&U Co. repeats the substance of the learned intermediary doctrine as applicable to prescription drugs. *See Walls* at *2. Only prescription medications, P&U Co. contends, are governed by the learned intermediary doctrine. P&U Co. quotes the *Stone* case as follows: "[W]e cannot quarrel with the general proposition that where *prescription* drugs are concerned, the manufacturer's duty to warn is *limited* to an obligation *to advise the prescribing physician* of any potential dangers that may result from the drug's use. This special standard for prescription drugs

21

is an *understandable exception to the Restatement's general rule* that one who markets the goods must warn foreseeable ultimate users of dangers inherent in his products." (Emphasis added). P&U Co. argues that the collective authority of *Walls, In re: Baycol*, and *In re Rezulin* should govern the fraudulent joinder issue rather than the *Clay* case (involving tobacco).

When faced with a fraudulent joinder issue, P&U Co. argues, this court should "pierc[e] the pleadings and consider[] summary judgment-type evidence such as affidavits and deposition testimony." *See Sellers v. Foremost Ins. Co.*, 924 F. Supp. 1116, 1118 (M.D. Ala. 1996)(citation omitted). *Sellers* further provided: "Tolerance of factual contentions . . . when specifically identified as made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances; it is not a license to join parties [or] make claims . . . without any factual basis or justification."(quoting F.R.C.P. 11, Comm. Notes).

**B.    Responsive Argument**

The *Rezulin* and *Baycol* courts, P&U Co. argues, considered Alabama law. According to P&U Co., plaintiffs have not attempted to distinguish those cases. Both cases involved individual employees of prescription drug manufacturers, P&U Co. points out, making those individual employees substantially closer to the manufacture of the product at issue than Watson (who was the employee of a commercial distributor of the product). P&U Co. again highlights *Rezulin*'s assessment of the sales representative: "As a corporate employee, he was not 'the one best able' to prevent sales of defective drugs. In light of the Alabama Supreme Court's clear explanation of the AEMLD's scope and purpose, there is no reasonable basis for supposing that it would impose liability on the sales representative in this case."

22

Furthermore, P&U Co. argues, plaintiffs have not acknowledged the *Bowman v. Coleman* decision (No. 96-0448-P-C)(S.D. Ala. 1996), which held that a salesperson was fraudulently joined under AEMLD and negligence theories because (1) "the policy goals underlying the AEMLD would not be advanced in any way by holding persons . . . liable in their role as . . . sales representatives" and (2) the salesperson was "neither a seller nor a manufacturer." Finally, P&U Co. argues, the Fowlers have not adequately distinguished *Walls*.

According to P&U Co., plaintiffs have failed to show Watson's involvement in Mrs. Fowler's prescription and failed to present evidence of Watson personally participating in any tort against them. Instead, P&U Co. argues: "[P]laintiffs coyly try to avoid this considerable problem in their pleadings by citing to generic information describing similar employees' job responsibilities downloaded from the internet. Further, by taking bits and pieces of information from this website, they make the incredible suggestion that Mr. Watson was responsible for the plaintiffs' receipt of the product at issue for a purpose *other* than that provided in the FDA-approved labeling accompanying the product – an allegation completely absent from the complaint." In this vein, P&U Co. repeats information from Watson's affidavit. *See supra.*

Moreover, P&U Co. argues, the *Clay* court's finding of "superior knowledge" of a tobacco account manager is irrelevant to this case, since Depo Provera is a prescription drug. In *Clay*, P&U Co. contends, the court concluded that tobacco managers were not fraudulently joined in a cigarette products liability action since they were "likely to hold some superior knowledge regarding the nature of cigarettes." *See* 77 F. Supp. 2d at 1224. In the pharmaceutical context, P&U Co. asserts, the element of "superior knowledge" of a sales representative, or even a pharmacist, is irrelevant. P&U Co. argues: "Anyone of legal age may walk into numerous retail establishments and purchase

23

cigarettes if they so choose. This stands in stark contrast to the manner in which one obtains a prescription medications, ..., [i.e.,] only ... from licensed physicians. These physicians' decisions on whether or not to prescribe a given medication depend upon a host of factors based upon their training, experience, and a patient's unique needs."[23]

Defendant P&U Co. repeats the reasoning and holding of *Walls* and argues: "If a pharmacist, who has actual contact with the patient, has not duty to warn a consumer under Alabama tort law, how could any such duty exist for a distributor who has no contact with the ultimate consumer?"[24] This court, P&U Co. argues, should disregard plaintiffs' attempts to circumscribe the *Walls* holding. According to P&U Co., it is the type of product at issue in *Walls* that drove the court to conclude that the learned intermediary doctrine exempts from the duty to warn non-physicians in the chain of distribution. In fact, defendant argues, *Walls* undermines every aspect of plaintiffs' argument that they may be able to make a case against Watson for allegedly possessing superior knowledge and

---

[23] P&U Co. quotes *Walls* as follows:

> [F]or it is only the physician who can relate the propensities of the drug to the physical idiosyncracies of the patient. 'It is the physician who is in the best position to decide when to use and how and when to inform his patient regarding risks and benefits pertaining to drug therapy.'
>
> ...
>
> Neither the manufacturer nor pharmacist has the medical education or knowledge of the medical history of the patient which would justify a judicial imposition of a duty to intrude into the physician-patient relationship. In deciding whether to use the prescription drug, the patient relies primarily on the expertise and judgment of the physician. Proper weighing of the risks and benefits of the proposed drug treatment and determining what facts to tell the patient about the drug requires an individualized medical judgment based on knowledge of the patient and his or her medical condition.

[24] This court is of the opinion that the issue here is contact with the pharmacist and/or the physician, not the consumer.

24

participating in the sale and distribution. These precise arguments, P&U Co. asserts, were rejected by *Walls*. Although the pharmacist in *Walls* had superior knowledge and participated in the sale and distribution of the drug, P&U Co. argues, the *Walls* court still refused to impose liability. Thus, P&U Co. concludes, Watson cannot be liable even if he proved that he did have superior knowledge and participated in the sale and distribution of the Depo-Provera allegedly administered to Mrs. Fowler.

### III.    Plaintiffs' Reply[25]

####    A.    Plaintiffs Have Shown That Watson Was Involved in Fowler Receiving Depo-Provera

Relying on an amended complaint served on May 28, 2004,[26] plaintiffs argue, they have specifically alleged that Watson is liable pursuant to Alabama common law theories of negligence/wantonness for promoting Depo Provera for an off-label use not approved by the FDA.[27]

---

[25] The Fowlers highlight the holding in *Triggs v. John Crump Toyota*, 154 F.3d 1284 (11th Cir. 1998): "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Triggs* further stated: "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate."

[26] *See* Pl. Reply, Ex. A.

[27] The amended complaint alleges:

At the time of the time of the incident made the basis of this lawsuit, Watson negligently, wantonly, and intentionally, promoted the use of the drug Depo Provera to a group of doctors who practiced under the name Henderson Walton Women's Center (Hereinafter Henderson Walton) for use by the physicians at Henderson Walton for administration to their patients, including ... Margie Fowler, for the management of the condition known as endometriosis.

Watson communicated with the physicians and staff at Henderson Walton on a direct one-to-one basis and promoted the sale of Depo Provera. In the course of this promotion Defendant Watson advised the physicians as to the applications and uses of

25

According to plaintiffs, Henderson Walton is still Watson's client, and Watson used the following means to promote Depo Provera to the physicians at Henderson Walton: direct one-to-one communication with those physicians; field promotion work and aggressive development of new accounts and growing existing accounts; assistance in the best application of Depo-Provera to Henderson Walton physicians; explanation of the features/merits of Depo Provera to such physicians; and use of persuasive sales techniques. As an account manager for Depo Provera, the

the product utilizing product promotional literature, "personal persuasive sales techniques," and provided other incentives to promote sales of the subject drug the treatment and management of endometriosis.

Watson engaged in these promotional efforts on a personal and individual basis and served to gain financially from such promotion. At the time these promotional efforts were undertaken, Watson knew or had reason to know that the Drug Depo Provera was not (nor is the drug currently) approved by the FDA for the management of endometriosis but was only approved by the FDA and, as per the drug warning label published by the drug manufacturer, indicated only for the prevention of pregnancy. The promotion of the drug for a purpose not approved by the FDA was in direct violation of the Food, Drug, and Cosmetic Act.

Said negligently, wanton, reckless and intentional promotion of this drug caused and/or contributed to the administration of Depo Provera of Plaintiff, Margie Fowler, which proximately caused the plaintiff to suffer a stroke.

Plaintiffs, this court notes, rely upon the affidavit of one of their attorneys in the case, Ms. Harrington. Ms. Harrington's affidavit provided:

Prior to filing this action, I called the office of the physician who administered the drug, Depo Provera (the drug which is the subject of the above case) to Margie Fowler. I asked the individual in charge of purchasing this medication, for the name of the company from which Ms. Fowler's physician obtained the Depo-Provera. I was told the drug was purchased for all the doctors at Henderson Walton Women's Clinic from the McKesson Corporation. I asked if that was where they would have purchased the drug from in 2001 and 2002 and was told yes. I contacted McKesson Corporation and asked the name of the person who was responsible for the sale of Depo-Provera to the Henderson Walton Women's Clinic in Birmingham, Alabama. I was told Charlie Watson.

26

Fowlers argue, Watson knew or had reason to know that Depo Provera was not FDA-approved for the treatment of endometriosis. Plaintiffs contend that Watson should not have promoted this use of Depo Provera and/or should have informed the physicians at Henderson Walton that Depo Provera was not approved for this use.

**B.     Defendants' Caselaw Is Neither Applicable Nor Relevant**

First, the Fowlers argue, *In re Rezulin* is distinguishable because it involved a sales representative. In the instant case, plaintiffs emphasize, Watson is an account manager rather than a sales representative.[28] Furthermore, the Fowlers argue, *In re Rezulin* did not state that liability could not be imposed on a pharmaceutical sales representative pursuant to the AEMLD; instead, the *Rezulin* court concluded that the Alabama Supreme Court would not impose liability pursuant to the AEMLD on the particular sales representative in that case. Additionally, plaintiffs argue, the *Rezulin* court did not address whether plaintiff had a negligence claim against the defendant sales representative. Most importantly, the Fowlers contend, the *Rezulin* court based its finding of fraudulent joinder on the facts that the plaintiff did not respond the affidavit filed by defendant sales representative, that the plaintiff had not shown that the sales representative sold the defective product to the decedent or decedent's doctor, that the plaintiff had not established the connection needed between the decedent and the sales representative to support a claim for fraud or fraudulent suppression, and that the sales representative at issue was not "the one best able" to prevent sales of defective drugs. Here, plaintiffs argue, those factors are not present, since plaintiffs (1) have responded to and contradicted Watson's affidavit by using McKesson's own website and (2) did not

---

[28] According to plaintiff, the McKesson website describes account managers and sales representatives as two separate positions. *See* Pl. Reply, Ex. C.

plead a fraud count in their complaint against Watson. Finally, plaintiffs assert, as an account

manager (and pursuant to his job description) "Watson's superior knowledge would have made him

highly capable of preventing the sale of defective drugs and/or the improper use of a drug." In

reliance on the posted job description, plaintiff contend that Watson had one to one contact with the

Henderson Walton physicians and therefore would have received first hand knowledge of reports

from those physician's patients if there had been problems with Depo Provera. Plaintiffs ask: "Who

better for the company to rely on but their own account manager for information as to whether a

product is useful and effective or defective?"

According to plaintiff, *In re Baycol* represents a decision of a foreign court which has

admitted that "no Alabama state court decision specifically addresses whether a district manager of

sales manager could be held liable under the AEMLD." Notably, plaintiffs argue, the *Baycol* court

found the district manager and sales manager not liable while admitting the absence of an Alabama

state court decision upon which to base its finding.

Furthermore, the Fowlers argue, *Bowman v. Coleman* (relied upon in *Baycol*) is

distinguishable. In that case, the plaintiff sued the store manager of Lowe's along with Lowe's

Home Centers, Inc. and Coleman Company, Inc. because a Coleman heater purchased at Lowe's

malfunctioned. According to the Fowlers, an account manager at McKesson and a store manager

at Lowe's are not comparable "due to the difference in each one's educational background and

knowledge of their products." In this vein, plaintiffs contend:

> A store manager at Lowe's may or may not have a college degree. A four year
> college degree is required of an account manager at McKesson. A store manager at
> Lowe's sells a greater number as well as a wider variety of products than an account
> manager at McKesson. Therefore, there is no way that a store manager at Lowe's
> could have the superior knowledge to be able to demonstrate every produce or
> service that his store offers nor could he provide assistance in the best application of

every product which Lowe's carries. However, being able to demonstrate products and/or services as well as provide assistance in the best application of those products and services is part of Defendant Watson's job. He is able to accomplish those tasks because he only sells, supplies, and distributes medical and surgical products.

Additionally, plaintiffs note, the *Baycol* court also relied on the affidavits which the defendant district manager and sales manager supplied in that case and in *In re Rezulin*. The Fowlers reiterate that they have responded to Watson's affidavit and shown, via his employer's website, that the affidavit is not accurate with respect to Watson's job description and duties.

Finally, plaintiffs assert, *Walls* is inapposite based on the same reasons asserted *supra*. Fowler also disputes P&U Co.'s statement that "Only prescription medications – not other products, including tobacco – are governed by the learned intermediary doctrine"; instead, Fowler argues, the learned intermediary doctrine would involve complex products, which include tobacco and tobacco litigation. Plaintiffs reiterate that the *Walls* court specifically answered a very limited question regarding pharmacists and thus only applies to pharmacists and not to account managers or sales representatives of drug companies.

## CONCLUSIONS OF THE COURT

This case represents the usual tension between what has been called this court's "unflagging" duty to exercise its jurisdiction when present[29] and the admonishments against accepting diversity jurisdiction when there are "possible" claims against non-diverse defendants. The difficulty of resolving such tension is exacerbated by the effort of each side to stretch every possible nuance from every possible case. One would think that the difference might be whether a party will remain on death row or freed to return to the idyllic confines of a country home.

---

[29] *See Moorer v. Demopolis Waterworks and Sewer Bd.*, 2004 WL 1300156 (11th Cir. 2004)(*quoting Colorado River Water Conservation Dist. v. U.S.*, 965 S. Ct. 1236 (1976)).

29

A further feature of this dilemma is the fact that the issue is supposed to be decided based upon objective standards but is usually influenced by the deciding courts' subjective leanings. It is tempting to quickly dispose of a case on a non-appealable basis.

Surely, as always, this court must look for some solution which does not lend itself to either arbitrariness or capriciousness. The court assumes that in this context, "possible" means more than such a possibility that a designated residence can be hit by a meteor tonight. It is possible. Surely, as in other instances, reason and common sense have some role. Surely, in the absence of total hostility toward diversity jurisdiction, the mere naming of purely adjunct parties is not sufficient to defeat it. With these thoughts and the admonitions of controlling courts in mind, this court will attempt to resolve the issues here.

The parties have not cited any directly applicable Alabama or controlling federal court cases. This court is satisfied, based upon the cases which have been cited, that there is no possibility of recovery on the claims asserted here against Watson unless there is evidence that he personally and actively sold or promoted the alleged product to applicable pharmacies or physicians after he had knowledge that the product was dangerous or defective or after he had knowledge that warnings had not been otherwise appropriately given. Here, there is no such allegation and certainly no substantial evidence to rebut evidence to the contrary.

This court is not persuaded, to any extent, by *Walls*. On the other hand, this court is at least partially persuaded by the *Rezulin* and *Baycol* cases. Those courts perhaps go further than this court would go in that they may exclude claims against even active, knowledgeable sales representatives (or account managers). While those are likely correctly holdings with regard to AEMLD claims, they may not be appropriate for failure to warn or suppression claims. Here, however, there is no

30

sufficient allegation or evidence to support the latter type claims.[30]

The motion to dismiss will be granted.  The motion to remand will be denied.[31]

This ____ of June, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[30] This case is to be decided based on the allegations in the complaint at the time of removal, not as later amended.

[31] Plaintiffs have agreed that an adverse ruling on one calls for an adverse ruling on the other.

31