IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JAMES O. STRUTHERS, Individually, and as Administrator of the Estate of ALICIA STRUTHERS, deceased, <br><br> Plaintiff. <br><br> v. <br><br> MERCK & CO., INC., a foreign Corporation; ANNE BRANDON, an Individual; LAMONDE RUSSELL, an Individual; and fictitious Defendants A, B, C & D, being those persons, firms or Corporations whose fraud, scheme to defraud, and/or other wrongful conduct caused or contributed to the Plaintiff's injuries and damages, and whose true names and identities are presently unknown to Plaintiff, but will be substituted by amendment when ascertained, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) CASE NO. 2:06-CV-00127-MHT-SRW ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**PLAINTIFF'S SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO REMAND**

COMES NOW the Plaintiff, James O. Struthers, and submits his supplemental brief in support of his Motion to Remand, as required by this Court's Order, dated March 2, 2006. For the following reasons, set forth more fully below, Plaintiff requests this Court enter an order remanding this case to the Circuit Court of Montgomery County, Alabama:

A.  **Plaintiff Withdraws Part IV.B. of His Brief in Support of Motion to Remand.**

In his initial remand brief, the Plaintiff argued that Defendant Merck failed to obtain the consent of all of the named defendants prior to seeking removal. This appears to be an inaccurate statement. Declarations were filed by the individual named Defendants, Anne Brandon and Lamonde Russell. As such, it appears that all served Defendants joined in the removal action.

B.  **Legg v. Wyeth is Not Controlling or Dispositive of the Issues in this Matter.**

This Court has requested that the parties submit supplemental briefs to address the impact of the recent decision of the United States Court of Appeals for the Eleventh Circuit, Legg v. Wyeth, 428 F.3d 1317 (11th Cir. 2005), a case cited and relied upon by Defendant Merck in its removal petition. Legg v. Wyeth does not alter the remand proceedings, as indicated below, and Defendant Merck's argument to the contrary must fail.

1.  **Legg v. Wyeth is not controlling on the issue of subject matter jurisdiction and any language in Legg relative to the remand proceedings is dictum.**

In Legg, the issue before the appellate court was whether the district court abused its discretion by awarding attorney's fees and costs to the plaintiffs as a result of the removal petition filed by the defendant, a drug company manufacturer, Wyeth. Contrary to the position urged by Defendant Merck in the present cause, the issue was *not* whether the district court abused its discretion by remanding the case, after finding that the defendant failed to meet its burden of establishing fraudulent joinder. Indeed, the

2

Eleventh Circuit noted that "28 U.S.C. § 1447 (d) bars our review of a remand such as this one based upon the lack of subject matter jurisdiction," but "the statute does not 'exclude the district court's assessment of costs from appellate review.'" Legg, 428 F.3d at 1319-20 (quoting Fowler v. Safeco Ins. Co., 915 F.2d 616, 617 (11th Cir. 1990)). The Court in Legg did not state that the trial court's remand order was in error, nor did the Court rule that the standard of review in such cases should be changed.

Since the language of Legg relied upon by Defendant Merck is not essential to the issue in that case, it is merely dictum and should not be given *stare decisis* effect by this Court. Nevertheless, assuming *arguendo* that this Court should defer to Legg on this issue, the Legg court's holding is in contravention of well-settled Alabama law, which provides that misrepresentations of material fact, even if made by mistake or innocently, constitute legal fraud. See Ala. Code § 6-5-101 (1975). See also Thomas v. Halstead, 605 So.2d 1181 (Ala. 1993). As discussed above, Alabama law is well-established that individual employees can be held liable for torts in which they participate.

The Court in Legg cites Fisher v. Comer Plantation, 772 So. 2d 455, 463 (Ala. 2000), for the proposition that "mere conduits" cannot be held liable for participating in a tort unless bad faith can be shown. Fisher, however, dealt with independent contractors. The sales representatives here were not "mere conduits" of information, but were instead an integral part of the false and fraudulent marketing and selling of Vioxx.

Since the Eleventh Circuit did not have within its jurisdiction the ability to address the merits of the remand order in Legg, any discussion of the merits of the district court's order remanding the case back to state court is dictum and has no legal,

3

precedential value. As a result, this Court should disregard that aspect of the Legg decision.

**2. Even if the Eleventh Circuit's substantive discussion of removal and remand proceedings in Legg v. Wyeth should be considered, the "evidence" before the Court in this cause is more than sufficient to establish that there is a "possibility" of recovery against the Resident Defendants.**

In reaching its decision that the district court erred by awarding attorney's fees and costs to the plaintiff in Legg, the Eleventh Circuit considered the fact before it that the defendant submitted uncontested affidavits of the sales representatives to establish that they were not active participants in the alleged wrongdoing as set forth in the complaint. The defendant, Wyeth, in arguing that it had wrongfully been ordered to pay attorney's fees, argued that the sales representatives were named in the plaintiff's complaint as a means of fraudulent joinder to defeat federal diversity jurisdiction. Wyeth submitted affidavits of the three named sales representatives to establish that they did not have prior knowledge of the subject drug's propensity to increase the risk of valvular heart disease. The plaintiffs responded to this contention by pointing to sales materials and other documents to support its claims. The appellate court observed, however, that the sales training materials did "not contain any warning to the sales representatives that Redux may cause valvular heart disease." Legg at 1322. As the court noted, the absence of such warnings reinforced the claims of the sales representatives made by them in their affidavits.

The Eleventh Circuit, in determining that Wyeth's removal efforts were "reasonable," a basis to determine whether the attorney's fees were wrongfully awarded,

4

appeared to be critical of the lower court's remand order, because there did not appear to be any refutation of the affidavits of the sales representatives, other than the allegations in the complaint. Such is not the case here.

In the Declarations of Lamonde Russell and Anne Brandon, submitted by Defendant Merck in this case, the Merck sales representatives contend in conclusory fashion that they were not active participants in the wrongdoing to the extent they would be subject to liability under Alabama law for the claims asserted by the Plaintiff in his complaint. However, it is not their contentions in the Declarations that bear the most attention; rather, it is the absence of a critical contention that neither Russell nor Brandon makes, which should be the focus of this Court's attention. <u>Nowhere in the Declarations does either party assert that they lacked specific knowledge about the dangerous propensities of Vioxx, particularly with respect to the increased risk of cardiovascular and cerebrovascular events, prior to the time the drug was prescribed by Alicia Struther's physician.</u> The reason why they do not make such a claim is because, if they had done so, they would have clearly perjured themselves, based upon the known evidence in this case, some of which was averred and submitted with the Complaint and restated in Plaintiff's initial remand brief.

As set forth in the Complaint, Defendant Merck went through great lengths to hide the increased cardiovascular risks associated with Vioxx. These efforts were accomplished primarily by the company teaching its sales representatives to suppress material facts and information about the dangerous aspects of the drug from physicians who commonly prescribed the drug to others, including Alicia Struthers. Part of that process involved the infamous "Dodge Ball" training, where sales representatives were

told to dodge or avoid the questions of suspecting physicians. Questions from physicians became known as "Obstacles" to the sales of the drug, Vioxx -- sales which were used to determine sales representatives' commissions. Some of the "Obstacles" specifically identified the cardiovascular risk issues to the sales representatives. One such "Obstacle" provided: "'I am concerned about the cardiovascular effects of Vioxx?'" Another provided: "The competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than Celebrex."[1]

In response to these perceived "Obstacles," or questions from physicians, the sales representatives were trained to respond in a fashion to downplay or suppress the seriousness of the cardiovascular risks associated with Defendant Merck's blockbuster drug, Vioxx. For example, Defendant Merck designed "Obstacle Responses" to be used by its sales representatives in responding to these very important inquiries.[2] In response to an inquiry that a physician might make about the potential for Vioxx increasing the risk of cardiovascular events, the sales representatives were taught to respond:

> "Doctor, once daily VIOXX has no effect on platelet aggregation, and therefore would not be expected to demonstrate reductions in MI or other CV events. Agents such as low-dose aspirin are routinely prescribed for CV patients for their effect on the inhibition of platelet aggregation. Therefore, once daily VIOXX® is not a substitute for aspirin for cardiovascular prophylaxis...."

The training materials then direct the sales representatives to "[t]ransition back" to other benefits of the drug, no doubt as a way to avoid further questions. This response, as clearly indicated, in no wise addresses the cardiovascular risks associated with Vioxx.

---

[1] Though part of Exhibit "A" to the Complaint, these specific "Obstacles" are reattached to this brief as Exhibit "E."

[2] These Obstacle Responses are attached as Exhibits "B" and "C" to the Complaint. The specific responses noted herein are reattached to this brief as "Exhibit "F."

6

More compelling, if a physician inquired about the comparison of the safety profile between Vioxx and Celebrex, a competing COX-2 drug, the sales representatives were taught to respond:

> "Doctor, there are no head-to-head studies comparing the cardiovascular profile of the two drugs. As a result, you cannot compare the drugs and conclude that one drug had fewer events than the other. What you may be referring to is press reports of the incidence rates in two separate studies. In the VIOXX GI Outcomes Trial (VIGOR), the incidence of MI was 0.4% with VIOXX and 0.1% with naproxen. Upon further analysis, four percent of patients in the VIOXX GI Outcomes Study had experienced a cardiac event such as a heart attack or stroke before entering the study and thus met the established criteria for the use of aspirin for secondary CV prophylaxis. In the remaining 96% of patients for whom aspirin was not indicated for secondary CV prophylaxis, the incidence of MI was lower – 0.2% for VIOXX and 0.1% for naproxen. The difference was not statistically significant.
>
> "....
>
> "If needed, continue to address the physicians concerns with the cardiovascular effects of VIOXX by guiding them through the Cardiovascular Card[3] ...."

The training materials went on to again encourage the sales representative to "[t]ransition back" to the benefits of the drug, while downplaying the CV risks. Most disconcerting, however, is that the information about VIGOR was totally and completely false. Instead of being a 4 to 1 ratio of heart attacks, comparing Vioxx to naproxen, the rate in VIGOR was actually 5 to 1, a significant fact that was suppressed by Defendant Merck from physicians. Had the full truth been told to doctors, i.e., that there is a 500 times increased risk of heart attacks and strokes for patients on Vioxx as compared to naproxen, doctors

---

[3] The Cardiovascular Card itself was filled with omissions and inaccurate information, and was designed not to disclose the cardiovascular risks, but to address the gastrointestinal benefits of the drug. The sales representatives were also not told to inform the physicians that the aspirin-indicated patients were excluded from VIGOR as a way to skew the results of that study. If at-risk patients, such as were in the 4% aspirin-indicated group, were included in the study, it is widely agreed the severity of the cardiovascular risks borne out of VIGOR would have been much more pronounced.

would have been much less likely to accept the lie told by Defendant Merck that the explanation for the VIGOR results was that naproxen is cardioprotective.

Moreover, sales representatives were instructed by Defendant Merck to avoid discussing VIGOR with physicians. Routinely, Defendant Merck would submit Bulletins to its sales force, telling them what they could and could not discuss with physicians. In one such "Bulletin for VIOXX®", the sales representatives were directed: **"DO NOT INITIATE DISCUSSIONS ON THE FDA ARTHRITIS ADVISORY COMMITTEE (ADIVSORY COMMITTEE) REVIEW OR THE RESULTS OF THE VIOXX® GI OUTCOMES RESEARCH (VIGOR) STUDY. YOU MAY RESPOND TO CUSTOMER INQUIRIES ONLY AS OUTLINED BELOW."** The Bulletin goes on to direct the sales representatives to "Stay Focused on Efficacy," and encourages the sales representatives to direct the physician's attentions away from the dangers of the drug and get them focused back on the drug's efficacy.[4] This document establishes that there is more than a mere possibility that the sales representatives were active participants in providing misinformation to physicians, in suppressing the known dangers of the drug, and in encouraging physicians to sell a dangerous and deadly product, namely, Vioxx. This document also debunks a concern of the Legg court -- the sales representatives in the present case were clearly knowledgeable of the known dangers and had greater knowledge than the physicians who were prescribing the drug.

To cover all of the examples of the sales representatives being part of the scheme would take hundreds of pages of briefing. Suffice it to say, as it relates to the issue

---

[4] Though part of Exhibit "E" to the Complaint, this specific Bulletin is reattached to this Brief as Exhibit "G".

before the Court, the focus is whether the sales representatives, such as Lamonde Russell and Anne Brandon, knew or had reason to know of the cardiovascular risks associated with Vioxx and whether there is a reasonable "possibility" that the Plaintiff can prove his claims that they are liable under Alabama law. As set forth in the remand brief filed with this Court, Lamonde Russell and Anne Brandon are liable for their active roles in promoting, selling, and distributing a dangerous product, Vioxx. As a result, they were not fraudulently joined, and this cause is due to be remanded back to state court.

## V.     CONCLUSION

In all of its efforts, Defendant Merck has failed to cite any directly applicable or controlling authority and consequently it has failed in its burden of proving that there is no possibility that Plaintiff can establish a cause of action against the Resident Defendants, Anne Brandon and Lamonde Russell. For the reasons outlined above, this Court lacks subject matter jurisdiction. Therefore, Plaintiff respectfully urges the Court to remand this action in its entirety to the Circuit Court of Montgomery County, Alabama.

Respectfully submitted this 7th day of March, 2006.

/s/ J. Paul Sizemore
**ANDY D. BIRCHFIELD, JR. (BIR006)**
**J. PAUL SIZEMORE (SIZ 004)**
**BENJAMIN L. LOCKLAR (LOC009)**
**W. ROGER SMITH, III (SMI257)**
**Attorneys for Plaintiff**

OF COUNSEL:

**BEASLEY, ALLEN, CROW, METHVIN,
  PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 223-1236

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon the parties as listed below by placing a copy of same in the United States Mail, first class, postage prepaid on this the 7th day of March, 2006.

Richard Garrett
Mike Brock
F. Chadwick Morriss
**RUSHTON, STAKELY, JOHNSTON
 & GARRETT, P.A.**
Post Office Box 270
Montgomery, Alabama 36101-0270

                                    /s/ J. Paul Sizemore
                                    **OF COUNSEL**